OPINION JUDGMENT ENTRY
{¶ 1} Defendant-appellant Steven Hartman ("Hartman") appeals that portion of the Mansfield Municipal Court's October 23, 2003 Judgment Entry which granted a money judgment against him in favor of plaintiff-appellee/cross-appellant Standard Plumbing and Heating ("Standard"). Standard cross-appeals that portion of the same judgment entry, which found Standard violated the Consumer Sales Practices Act and awarded attorney fees based upon the violation.
 STATEMENT OF THE FACTS AND CASE
{¶ 2} Early in 2000, Hartman was repairing a home located in Mansfield, Ohio. The home had been in Hartman's family for years, and had been his brother's residence since the 1960's. After his brother became disabled and was placed in assisted living, Hartman began repairing the home to rent it out.
{¶ 3} In April 2000, Hartman contacted Standard to repair the boiler in the house. Standard's general manager, Steve McLaughlin, gave appellant an oral estimate of $250.00. Standard billed Hartman $300.00, and Hartman paid the bill.
{¶ 4} In June 2000, Hartman contacted Standard to do some plumbing work at the house. Hartman indicated he would have some workers present at the house to help with the work. Standard told Hartman the work would take a day and a half, and would be billed at a rate of $45.00 per hour. Standard did not tell Hartman there would be more than one plumber on the job, nor did Standard provide Hartman with a written estimate for the plumbing work.
{¶ 5} Standard billed Hartman for four days of work performed by two plumbers. The total bill amounted to $3,250.00, with labor alone totaling $2,520.00. Hartman did not pay the bill.
{¶ 6} On January 3, 2002, Standard filed a complaint against Hartman in the Mansfield Municipal Court alleging breach of contract, unjust enrichment and quasi contract.
{¶ 7} On January 14, 2002, Hartman counterclaimed for Standard's alleged violation of the Ohio Consumer Protection Act.
{¶ 8} The magistrate, via a March 26, 2003 Magistrate's Decision, found a valid oral contract existed between the parties and found Hartman had been unjustly enriched due to the work completed on the house. The magistrate also found Standard violated the Ohio Consumer Protection Act by failing to provide Hartman with a written estimate prior to performing the work. The magistrate awarded Hartman his attorney fees based on the violation.
{¶ 9} On August 20, 2003, the trial court judge overruled the parties' objections to the March 26, 2003 Magistrate's Decision.
{¶ 10} Appellant Hartman assigns as error:
{¶ 11} "I. There was no evidence in the record to support a finding of unjust enrichment.
{¶ 12} "II. There was no evidence to support a finding of oral contract between the parties.
{¶ 13} "III. The plaintiff violated the ohio consumer protection statute. Therefore, he has no right to recover against the defendant."
 I
{¶ 14} Hartman's first and second assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
{¶ 15} Appellant Hartman essentially argues he did not know two plumbers were on the job, and he was never advised by Standard the work would take more time than the quoted day and a half. Standard maintains the initial work requested by Hartman would have been completed in approximately a day and a half to two days; however, while Standard's plumbers were on the job, Hartman's workers requested additional labor and materials which doubled the scope of the work initially requested. Standard further argues Hartman should have known there were two plumbers working on the job as his own workers were present at the house.
{¶ 16} At trial, Steve McLaughlin, Standard's General Manager, testified he told Hartman the work initially requested would take a day and a half to two days to complete and Standard would charge $45.00 per hour for labor and 20% markup on materials. McLaughlin testified:
{¶ 17} "Q. Did Mr. Hartman tell you that Mr. Landis was the man in charge out there on the site?
{¶ 18} "A. Yes, he did, he said, I will have my man in charge meet you and go over the things — the scope of the work that's what took place.
{¶ 19} "Q. So Mr. Landis was the one who told you about the initial scope of work?
{¶ 20} "A. Yes.
{¶ 21} Tr. at 228-229.
{¶ 22} He also testified as to the additional work performed:
{¶ 23} "Q. Do you remember the individual who requested you to perform that work?
{¶ 24} "A. Ah, the foreman, or gentlemen working on that job.
{¶ 25} "Q. Was that individual working for Mr. Hartman?
{¶ 26} "A. Yes.
{¶ 27} "Q. The owner?
{¶ 28} "A. Yes, that was my understanding, yes.
{¶ 29} "Q. And would his name have been Rick Landis?
{¶ 30} "A. Yes, that does sound — sound right.
{¶ 31} "Q. While you were working on this job, this Hartman Printing job, what additional work did Mr. Landis request you to perform?
{¶ 32} "A. Ah, there was — on the first floor, a shower to be installed at the present — or at that time there was, ah, there was an old style lavatory, and water closet in the — oversized closet is about what it was, off of the kitchen, and he wanted a single stall shower installed, and the lavy was in vile repair, so we replaced the lavatory, ah, also, ah, there was a problem with the kitchen sink, it was plugged, we, ah, snaked the drain out, replaced the trap on the kitchen sink, got it back in working order, and also there was a water closet on the second floor that, ah, was leaking at the seal, it was, ah, pulled up, it had to have a new closet flange put on it, that was — it was old — it was new, so replaced that, reset the water closet up there.
{¶ 33} "Q. Okay. You've mentioned that you were requested to hook up a shower on that first floor bathroom?
{¶ 34} "A. Yes.
{¶ 35} "Q. Was that requested of you by Mr. Landis after you had already been on the job for some time?
{¶ 36} "A. Yes, it was.
* * *
{¶ 37} "Q. We've had testimony about the additional work — the shower, the sink, the closet flange, the kitchen drain, and trap — was any of this work mentioned to you during your initial conversation with Mr. Hartman?
{¶ 38} "A. My initial conversation with Mr. Hartman all our work was in the basement, nothing was upstairs, no shower, no sink, no toilet flange, nothing beyond the basement, it was strictly splitting the gas service, hooking up the water heater, and fixing the broken soil pipe.
{¶ 39} "Q. So they've added additional work items, which were requested, while your man had already been out there on the job?
{¶ 40} "A. That is correct.
{¶ 41} "Q. And when this work was requested, did you have two men on that job when — when the Defendant requested that additional work?
{¶ 42} "A. Yes.
{¶ 43} "Q. How much time did the additional work take?
{¶ 44} "A. I'd have to say it probably took a day and a half, to two days. It was probably equal to the amount on the first job we did, I mean, it was — it was quite a job, to up, and putting a shower over a crawl space.
{¶ 45} "Q. Was all the work completed?
{¶ 46} "A. Yes.
{¶ 47} Tr. at 180-181, 212-214.
{¶ 48} Rick Landis, one of Hartman's workers present at the house, testified at trial:
{¶ 49} "Q. Okay. Do you know also, that while they were on the job, during the second day, there was some additional items requested that they take care of?
{¶ 50} "A. Yes.
{¶ 51} "Q. Okay. Did you request those, or did somebody else request those?
{¶ 52} "A. By the request of the landowner.
{¶ 53} "Q. By Mr. Hartman?
{¶ 54} "A. That is correct.
{¶ 55} "Q. He requested these additional items to be done?
{¶ 56} "A. Through a phone call, myself to Mr. Hartman, I was looking out for his interest that day.
{¶ 57} "Q. Okay. So you saw some additional things that needed done?
{¶ 58} "A. Yes.
{¶ 59} "Q. And you called Mr. Hartman, to okay it with him, before you had Standard workers do those items?
{¶ 60} "A. Yes, ah, any time there was a job that needed to be done it was — or that wasn't, ah, or wasn't mentioned earlier, a phone call was always made to Mr. Hartman regarding that.
{¶ 61} "Q. And you were, basically, acting as Mr. Hartman's agent on the job?
{¶ 62} "A. I guess, you could say that, yes.
{¶ 63} "Q. Okay. And, ah, the additional work would have involved installing a shower, a hook-up to the shower, and putting a drain into the shower?
{¶ 64} "A. I installed the shower, um, the gentlemen that was there installed, he installed the plumbing work.
{¶ 65} "Q. But the actual, ah, shower itself you — you put in?
{¶ 66} "A. That is correct.
{¶ 67} "Q. And the plumbing to the shower was done by Standard?
{¶ 68} "A. That is correct.
{¶ 69} "Q. And was the, ah, drain for the shower?
{¶ 70} "A. Correct.
{¶ 71} "Q. And in order to get at that plumbing work, they had to go through a crawl space and run hot and cold, ah, lines through there, did they not?
{¶ 72} "A Yes.
{¶ 73} "Q. Okay. And also part of the work that was requested on the job, would have been the installation of a new lavatory, and closet in the upstairs bathroom; is that correct?
{¶ 74} "A. No, that's not correct.
{¶ 75} "Q. Was that done?
{¶ 76} "A. Ah, there was a — the upstairs bath had, a wax ring replaced, it had a leak.
{¶ 77} "Q. I'm sorry, the downstairs bath, strike that?
{¶ 78} "A. The downstairs bath, um —
{¶ 79} "Q. A sink and a faucet?
{¶ 80} "A. There was a new sink that was installed along with the faucet.
{¶ 81} "Q. Okay. And that was part of the work that was requested on the job, after Standard had already been there?
{¶ 82} "A. Yes.
{¶ 83} "Q. That wasn't part of the initial work order? I can't — I wasn't part of that conversation. Well, you asked Standard's workers to do that, didn't you?
{¶ 84} "A. After consultating with Mr. Hartman, yes.
{¶ 85} "Q. After discussing it with Mr. Hartman. Okay. Also, part of the work that was done, while they were on the job, which was requested while they were on the job, was unplugging the kitchen drain; correct?
{¶ 86} "A. Yes.
{¶ 87} "* * *
{¶ 88} "Q. In any event, you would agree with me, Mr. Landis, that there was a number of items you requested Standard's workers to do on the job, after they had already been there, and after they had already discussed the initial scope of work with Mr. Hartman?
{¶ 89} "A. There was a few items, yes.
{¶ 90} "Q. Okay. And I've discussed those, have I not?
{¶ 91} "Yes."
{¶ 92} Tr. at 115-119.
{¶ 93} Upon review of the above, it is clear Landis acted as Hartman's agent on site. Hartman himself told Standard he would have men on the site, and indicated Landis had authority to act on his behalf. According to the above testimony, during the second day of the job, Landis requested additional work not previously agreed to by the parties. Landis, as well as Hartman's other workers on site, knew of the nature and extent of the additional work, and they also knew there was more than one plumber on the job at the time they requested the additional work. Accordingly, we do not find the trial court erred in finding for Standard on its claims for unjust enrichment and breach of contract for the work performed as requested on the second day of the job.
{¶ 94} As to the original work request, neither party disputes Steve McLaughlin advised Hartman the initial work requested would take a day and a half to two days to complete at a rate of $45 per hour for labor. While Steve McLaughlin testified as to Standard's "common practice" of informing customers as to the number of plumbers on site during a job, there is no evidence in the record demonstrating he actually told Hartman or Hartman knew there would be two plumbers on site during the initial work performed as agreed to by the parties. The parties never had a meeting of the minds concerning two plumbers. Rather, a reasonable interpretation of the agreement between the parties assumed a rate of $45 per hour for the labor. Accordingly, we find the judgment of the trial court should be reduced by the amount paid for the second plumber for the first day and a half of labor. The judgment should be reduced by $540, the equivalent of 12 hours — a day and a half of work — times the $45 per hour labor rate.
{¶ 95} Based upon the foregoing, appellant's first assignment of error is overruled as to the trial court's finding of unjust enrichment, but sustained as to the calculation of damages. The second assignment of error is likewise overruled.
 III
{¶ 96} Hartman's third assignment of error argues Standard's violation of the Consumer Sales Practices Act precludes Standard's recovery against him.
{¶ 97} The October 23, 2003 Magistrate's Decision states:
{¶ 98} "9. The Court finds that no written estimate was given for the April or June work and that no written estimate was offered. Further, the Court finds that the Defendant did not waive an estimate in writing.
{¶ 99} "* * *
{¶ 100} "11. The concept of the Defendant not being unjustly enriched because Plaintiff completed the work but failed to provide an estimate is inequitable. Defendant was unjustly enriched. Plaintiff may have violated a technical element of the law but that does not effect the equitable elements.
{¶ 101} "* * *
{¶ 102} "16. The Consumer Protection Act requires that a supplier, prior to the commencement of any repair or service, provide a `form which indicates the date, the identity of the supplier, the consumer's name and telephone number, the reasonably anticipated completion date and if requested by the consumer, the anticipated cost of the repair or service.' The estimate shall also have certain language, clearly noted on the form, that the consumer has the right to an estimate if the costs will exceed Twenty-five Dollars.
{¶ 103} "17. The issue of the written estimate is a technical requirement under the law.
{¶ 104} "The Court finds that the Plaintiff was a `supplier' and that the Defendant was the `consumer'.
{¶ 105} "18. The Court further finds that the Courts have consistently determined that even if there is no real damage to the consumer after the work is completed, the fact that there was a technical violation by the supplier of not providing a written estimate, requires that the Court consider granting the consumer attorney's fees.
{¶ 106} "19. Einhorn v. Ford Motor Co., (1990)48 Ohio St.3d 27 states that `this legislative purpose is better safeguarded by finding that `knowlingly' [sic] committing an act or practice in violation of R-C. 1345 means that the supplier need only intentially [sic] do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law for the court to grant attorney fees.' This same case was cited in the controlling case on this issueBuchanan v. Stiving, (1994) No. 93 CA-75, Fifth District, Richland Co., Ohio.
{¶ 107} "20. Therefore, based upon the controlling law on this issue, the Court finds that the Defendant is entitled to an award of attorney fees from the Plaintiff pursuant to R.C.1345.09(F)(2) because of the Appellee's knowing violation of the Consumer Sales Practices Act."
{¶ 108} Assuming, arguendo, Standard violated the act, the violation does not preclude Standard from recovering against Hartman for the value of the work performed under an unjust enrichment or contract theory. See, Altier Design, Inc. v.Campbell (1990), 68 Ohio App.3d 724; Brookville Airpark, Inc.v. Kuczak (March 11, 1992), Montgomery Co. App. No. 13006, unreported.
{¶ 109} While the provisions of the Consumer Sales Practices Act must be construed liberally to accomplish the purposes of the General Assembly, the scope of the relief provided must be determined exclusively from the provisions of the statute. R.C.1345.09 creates relief only in the form of a "cause of action" or "an individual action" brought to rescind the transaction or recover damages. The General Assembly has not established an alleged violation as an affirmative defense under Civ.R. 8(C) to the supplier's claim of unjust enrichment or breach of contract.
{¶ 110} Hartman's third assignment of error is overruled.
 Cross Appeal
{¶ 111} On cross-appeal, Standard raises the following assignment of error:
{¶ 112} "I. Cross-appellant's `technical violation' of the consumer sales practices act was the result of a good faith error pursuant to R.C. 1345.11.
{¶ 113} "II. The trial court erred in awarding attorney fees to defendant-appellant Hartman, because R.C. 1345.09 restricts an award of attorney fees to `the prevailing party.'
{¶ 114} "III. The trial court used an improper standard in awarding attorney fees to defendant-cross-appellee Hartman."
{¶ 115} The trial court's October 23, 2003 Judgment Entry adopted the Magistrate's Decision filed March 26, 2003. In the Magistrate's Decision, the issue of attorney fees due Hartman for Standard's "technical violation" of the Consumer Sales Practices Act was to be set for a full hearing before the magistrate. As such, the October 23, 2003 Judgment Entry is not a final appealable order as to appellant's claim of violation of the act despite the trial court's inclusion of Civil Rule 54(B) language. See, Kimble Mixer Co. v. St. Vincent (June 9, 2004), Tuscarawas App. No. 2003AP020014, unreported.
{¶ 116} Accordingly, we dismiss appellee/cross-appellant Standard's cross appeal for want of jurisdiction. No final appealable order exists with respect to Hartman's claim for violation of the Ohio Consumer Sales Practice Act.
{¶ 117} The judgment of the Mansfield Municipal Court is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion and the law.
Hoffman, P.J., Farmer, J. and Wise, J., concur.
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Mansfield Municipal Court is affirmed in part, reversed in part, and remanded for further proceedings in accordance with our opinion and the law. Costs to be divided equally between the parties.